IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| AUSTIN GATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF ATLANTA, | ) |
| HASSAN KHOKAR, individually, | ) |
| and J. BRAUNINGER, individually, and | ) |
| unknown SUPERVISOR JOHN DOE, | ) |
| individually, officers of the | ) |
| City of Atlanta Police Department | ) |
| | ) |
| Defendants. | ) |

## **COMPLAINT**

Plaintiff Austin Gates (hereinafter "Mr. Gates") hereby brings this

Complaint seeking damages and declaratory/injunctive relief for the violations of

his First, Fourth, and Fourteenth Amendment rights under the United States

Constitution and corollary rights under the Georgia Constitution, and shows as

follows:

## **JURISDICTION AND VENUE**

1.

This action arises under the authority vested in this Court by virtue of 42

U.S.C. § 1983.  Venue is appropriate under 28 U.S.C. § 1391.

## PARTIES AND SERVICE

2.

Austin Gates ("Mr. Gates") is a citizen of the State of Georgia who was unlawfully arrested for expressing constitutionally protected symbolic, political and anonymous speech during a peaceful protest on November 26, 2014.

3.

Defendant City of Atlanta is a city chartered under the laws of the State of Georgia, and is subject to the jurisdiction and venue of this Court.

4.

Defendant Officer Hassan Khokar ("Officer Khokar") was at all times herein mentioned a police officer of the City of Atlanta Police Department.  In that capacity, he was acting under color of state law during the relevant acts and omissions alleged herein.  He is being sued herein in his individual  capacity.

5.

Defendant Officer J. Brauninger ("Officer Brauninger") was at all times herein mentioned a police officer of the City of Atlanta Police Department.  In that capacity, he was acting under color of state law during the relevant acts and omissions alleged herein.  He is being sued herein in his individual capacity.

6.

Defendant UNKNOWN JOHN DOE SUPERVISOR, acted individually and

under color of state law, allegedly ordered "on loud speakers multiple times that anyone wearing a mask will be arrested"; "[t]his information was relayed by Unit 15 over the radio that anyone wearing a mask should be arrested."  See Offense Report, a true and correct copy of which is attached and incorporated herein as Exhibit A.

## FACTUAL ALLEGATIONS

### 7.

On November 26, 2014, Mr. Gates and fellow demonstrators were peacefully marching through throughout the City of Atlanta to protest the Ferguson, Missouri grand jury decision in a police shooting case.

### 8.

At the outset of the protest, some of the demonstrators were passing out "V for Vendetta" masks, and Mr. Gates was given one of these masks.[1]

---

[1] Since the release in 2006 of the film *V for Vendetta*, the use of stylized "Guy Fawkes" masks, with moustache and pointed beard, has become widespread internationally among groups protesting against politicians, banks and financial institutions.  See http://en.wikipedia.org/wiki/Guy_Fawkes_mask.  The Occupy Movement, born out of the Zuccotti Park-based Occupy Wall Street, adopted the mask in 2011.  See http://theweek.com/articles/463151/brief-history-guy-fawkes-mask.  The over-arching theme in all the protests worldwide was that one percent hold all the wealth while the rest struggle to survive. http://www.dailymail.co.uk/news/article-2058020/How-Guy-Fawkes-masks-symbol-anti-greed-protests-globe.html#ixzz3Yu1E9Da0.



9.

Mr. Gates wore the mask  to express himself and his disagreement with the

Ferguson, Missouri grand jury's decision.

10.

At no time, did Mr. Gates threaten, intimidate, or provoke the apprehension

of violence of anyone or intend to do so.  With the exception of the officers who

arrested him, no person expressed to him any issue whatsoever with his wearing of

the mask.

11.

At approximately 9:15 p.m. on November 26, 2014, Atlanta Police

Department officers dressed in full riot gear used bull-horns to tell the protestors to

disburse from the Peachtree Center area on Peachtree Street or they would be

arrested, yet left virtually no means of egress for the protestors to disperse.

12.

After about fifteen (15) minutes, the protestors continued to march in a different area where officers had not indicated the protesters could not march.

13.

At approximately 10:00 p.m., Mr. Gates and other protestors were marching down Marietta Street, an area where officers had not indicated marching was prohibited, heading towards the CNN Center.

14.

Mr. Gates noticed about five or six police cars trailing the protest at this time, but once the protestors were approximately three blocks from the CNN Center, a swarm of officers in full riot gear pushed their way into the crowd without warning.

15.

Officer Khokar then grabbed Mr. Gates by the shoulder, pulled Mr. Gates by the strap of his backpack and his shoulder, and told Mr. Gates to come with him.

16.

Mr. Gates asked what he had done and why he was being arrested, but Officer Khokar said nothing.

17.

Officer Khokar then directed and moved Mr. Gates to an area where other officers were standing about a block away from where Mr. Gaines was initially

seized.  Gates was not free to leave.

18.

The officers were conferring but appeared to be unsure of what to do with Mr. Gates, where to transport him, or who would transfer Mr. Gates.

19.

Officer Khokar then pushed Mr. Gates against a police car, handcuffed him with plastic cuffs and asked the driver to take him to a then-unknown destination for a then-unknown crime.

20.

At this point, Mr. Gates asked why he was being detained. Officer Khokar told him it was because he was "wearing a mask," and nothing more was said.

21.

After a few more moments of deliberation about what to do with Mr. Gates, he was shoved into the police car by Officer Khokar.

22.

The driver spent five minutes trying to figure out where he was taking Mr. Gates, and eventually drove him to the Zone 5 precinct.

23.

Mr. Gates was the first protestor to arrive at the precinct.

24.

Still apparently without an idea as to what they should do with Mr. Gates, the unnamed officers took Mr. Gates to a back room, sat him down in a chair, and searched him.

25.

Mr. Gates sat alone in that chair and was freezing cold for several minutes with his backpack hanging from his handcuffed hands.

26.

Then an unidentified officer in plain clothes began filling out a citation for Mr. Gates and asked him what he had done wrong, who arrested him, and why he was protesting.

27.

The officer in plain clothes seemed to be unsure of what crime to charge Mr. Gates with and could not locate Mr. Gates' arresting officer.

28.

Officer Khokar, however, eventually drafted an Offense Report alleging that Mr. Gates violated O.C.G.A. § 16-11-38:

> I observed Mr. Austin Gates wear a "V for Vendetta" mask. Mr. Gates was actively participating in a protest. The protest had been warned on the loud speakers multiple times that anyone wearing a mask will be arrested. This information was relayed by Unit 15 over the radio that anyone wearing a mask should be arrested. Mr. Gates still had his mask on. Mr. Gates was arrested for wearing a mask…No injuries were reported."

See Exhibit A, Offense Report.  Gates was not provided with the charge against

him until just prior to being processed at the Atlanta Police Department Zone Five

Precinct in downtown Atlanta.

29.

Contrary to the Offense Report, Mr. Gates neither heard a general order to

remove masks, nor was he given an individual warning to remove his mask at any

time by any person.

30.

As the supervising officer, Officer Brauninger reviewed this Offense Report

and authorized its issuance.

31.

Shortly after Mr. Gates spoke to the officer in plain clothes who issued the

Offense Report, another civilian was pushed into the room and was forced down

on the floor next to Mr. Gates.

32.

The man was in obvious pain, and like Mr. Gates, had no idea what he had

done wrong.

33.

Several more arrestees were filed into the room for the next forty-five

minutes, until they were collectively finally told to stand up, grabbed by different

officers, and escorted out of the precinct.

34.

Mr. Gates was then pushed onto a prisoner transport bus with the other arrestees, where they sat for about thirty minutes.

35.

Then the arrestees were escorted back off the bus and back into the police station in another large room.

36.

Mr. Gates was never read his *Miranda* rights.

37.

The officers then began to book the arrestees, took photos, and searched and collected property.

38.

After the booking process, which took about two hours, the arrestees were escorted back onto the prisoner transport bus.

39.

Soon officers boarded the prisoner transport bus and stated that Mr. Gates had to get back out of the bus again because he was going to the Fulton County Jail for a state crime.

40.

Mr. Gates was escorted back into the police station but still was not read his rights or told what his charges.

41.

The officers told Mr. Gates that they would have to get a warrant signed by a judge before they could take him to the Fulton County Jail.

42.

After another hour of waiting, Mr. Gates was taken to the Fulton County Jail.

43.

Once Mr. Gates was taken to the Fulton County Jail, he was processed, and was finally allowed to make a phone call at 5:00 a.m.

44.

At this time Mr. Gates posted bail of $500 but he was not released until four or five hours later, at 9:00 a.m. or 10:00 a.m.  The total period of his detainment was nearly twelve hours.

45.

During this detainment, Mr. Gates was not given any water or food, was not able to sleep.

46.

Once Mr. Gates was released, no one at the front desk could tell him where a

bus stop or train station was, so Mr. Gates wandered until he found a public street where he waited in the cold for thirty minutes before being picked up.

47.

On the evening of November 27, 2014, after he awoke, Mr. Gates checked his phone and saw several messages from friends alerting him that they saw his mugshot on the news.  The mugshot, with his face revealed, disclosed his identity as an otherwise anonymous protester.  The public viewing of his mugshot was a foreseeable consequence of his arrest and resulted from Defendant-City of Atlanta providing the mugshot to the press.

48.

Fearing that people would now think he was a criminal and the impact such publicity would have on his current job, Mr. Gates burst into tears.

49.

Mr. Gates was subjected to seeing his mugshot on articles from local news stations, one of which identified him as a "devil in disguise."

50.

His mugshot was also featured on the *Atlanta Constitution* website and on television at least three times.

51.

When Mr. Gates returned to work after Thanksgiving, he was embarrassed

when multiple employees who told him that they saw his picture in the news.

52.

Mr. Gates is now fearful about his reputation and employment possibilities now that his mugshot is widely available on the internet, which can be located upon a simple search of his name.

53.

Gates seeks to wear masks at protests in the future, and engage in anonymous speech, but fears that the policy of the City of Atlanta barring wearing of masks in protests under all circumstances will lead to future arrest.

### City of Atlanta's Responsibility for Harms Caused

54.

Unidentified Officer or Officers, Defendant John Doe, as final policymakers for the officers on the scene of the protest, issued the unconstitutional final policy-based order or orders to all protesters that they must remove all masks without regard to constitutional rights to wear such masks.  These repeated orders established a policy of the City of Atlanta that demonstrators could not wear masks under any circumstances during the protest, and that they would face arrest is they failed to remove masks.  While other basis for municipal liability are set forth below, these blanket orders alone establish municipal policy restricting the right to wear masks during the protest, and subjecting those who wore masks to arrests

regardless of circumstance or criminality.

55.

Unidentified Officer or Officers, Defendant John Doe, as final policymakers for the officers on the scene of the protest, issued the unconstitutional policy-based order or orders to all protesters must remove all masks without regard to constitutional rights to wear such masks.   These repeated orders established a policy of the City of Atlanta that persons could not wear masks under any circumstances during the protest, and that they would face arrest is they failed to remove masks.   While other basis for municipal liability are set forth below, these blanket orders alone establish municipal policy restricting the right to wear masks during the protest, and subjecting those who wore masks to arrests regardless of circumstance or criminality.

56.

Moreover, the City of Atlanta, as a matter of policy and practice, has routinely and customarily interfered with and often arrested citizens solely for constitutionally protected free speech activity -- a problem identified by its own Citizen Review Board.

57.

At least three recent legal matters have been settled by the City of Atlanta involving  officers who interfered with and arrested citizens solely for

constitutionally protected free speech.

58.

In *Anderson v. City of Atlanta,* No. 11-CV-3398-SCJ (N.D. Ga. 2011), Plaintiff, Felicia Anderson, brought this case against the City of Atlanta and one of its police officers alleging, among other things, that she was falsely arrested for photographing police activity that occurred in public and that this arrest was conducted pursuant to an unlawful policy and practice of the Atlanta Police Department ("APD").

59.

The parties ultimately reached a settlement on Ms. Anderson's claims that included a Consent Order requiring the City to revise Atlanta Police Department's Standard Operating Procedures ("SOP"), upgrade penalties and train officers every two years regarding these new changes to the SOP.

60.

The court-ordered language was never added to the Atlanta Police Department SOP, and the required training regarding these collective revisions was not timely entered and conducted and neither the policy nor training were in place at the time of this incident despite existing court orders

61.

The Order required the City of Atlanta to "permanently … implement"

14

specific revisions to the APD SOP and "to conduct mandatory in-person training of all Atlanta police officers every two years regarding these SOP revisions."

62.

More than two years later (including the time of the incident in this lawsuit), in deliberate indifference to both the existing Consent Order and to the obvious need for the policy and training outlined, the City still had not complied with the straightforward obligations imposed upon it by the Order.

63.

The City of Atlanta was held in contempt of court for its repeated failure to adopt policies and trainings required by existing Court orders dealing specifically with not interfering with citizens' free speech activities.

64.

The City of Atlanta's deliberate indifference to the need for policies and training regarding free speech activity generally, made patently clear by the Consent Order it entered into and then violated for years, was a moving force for the constitutional violations suffered by Gates.

65.

A custom was also created of repeatedly interfering and often arresting citizens who are engaged in free speech activity.  Dozens of individuals were arrested for legally participating in free speech protest activities, only to have their

charges dismissed as lacking even arguable probable cause.

66.

Further, in *Calhoun v. City of Atlanta*, No. 1:09-CV-3286-TCB (N.D. Ga. 2011), the City of Atlanta entered into a Consent Order whereby the City agreed to permanently revoke or amend all APD SOPs regarding warrantless searches, arrests, and investigatory detentions and frisks without reasonable articulable suspicion.

67.

The *Calhoun* Order required that the City of Atlanta conduct mandatory, in-person trainings by non-APD trainers for all sworn APD employees.  The Order required that the City of Atlanta provide recurring training on this issue to every sworn APD officer every two years.

68.

Despite these orders, APD did not add the court-ordered language to its SOPs and failed to conduct the first of the court-ordered training regarding the changes in SOPs until June 2015.

69.

Well over two years later (and at the time of the incident in this lawsuit), in deliberate indifference to ***both*** consent orders and to the obvious need for the policy and training outlined, the City still had not complied with the

straightforward obligations imposed upon it by the orders.

70.

At the time of Gates' arrest, the City still had not conducted the trainings that it was ordered to conduct in either the *Anderson* Order or the *Calhoun* Order.

71.

In *Calhoun* as well,  the City of Atlanta was held in contempt of court for its repeated failure to adopt policies and trainings required by existing Court orders dealing specifically with not interfering with citizens' photographing or filming of police activities.

72.

The City of Atlanta's deliberate indifference to the need for policies and training, made patently clear by the consent orders it entered into and then violated for years, was a moving force for the constitutional violations suffered by Gates. Moreover, the City's on-going refusal to comply with the consent orders created a *de facto* custom of APD officers repeatedly interfering with—and often arresting—citizens who are engaging in constitutionally protected free speech activity.

73.

Gates timely filed a ante-litem notice and demand, but received no response. A true and correct copy of Gates' ante-litem notice and demand is attached and incorporated herein as Exhibit B.

17

## Count I: Fourth Amendment

74.

This Count is alleged against each officer, in their individual capacities, and the City of Atlanta, under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution for unlawful seizure, false arrest and malicious prosecution.

75.

The facts within the Officers' knowledge were not sufficient to establish even arguable probable cause that Plaintiff violated O.C.G.A. § 16-11-38 or any other criminal offense.

76.

Based upon the facts known by the Officers, no reasonable police officer could believe that even arguable probable cause existed to arrest Plaintiff, and there was no arguable probable cause for his arrest.

77.

The Officers each acted with conscious indifference and reckless disregard for the consequences of their actions such that an award of punitive damages is authorized under federal law.

78.

The actions of the Officers were caused in part by the policies and practices

of the City of Atlanta that were a moving force for the harms caused.

## Count II: First Amendment

79.

This Count is alleged against the officers and the City of Atlanta  under 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the United States Constitution.

80.

Gates was engaged in clearly constitutionally protected anonymous free speech activity when he wore a mask at a protest.

81.

The seizure, arrest and interference for wearing a mask violated Gates' First Amendment rights.  Gates was engaged in constitutionally protected expressive conduct, and the restriction on speech was content based, not narrowly tailored to a substantial government interest, and failed to leave open ample alternative avenues of communication for the message.

82.

Moreover, the arrest for wearing a mask in a constitutionally protected way, and then revealing the identity of an anonymous protester, violated the constitutional right to engage in private, anonymous speech.   "[A]nonymous pamphlets, leaflets, brochures and even books have played an important role in the

progress of mankind....   Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all.'" McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 341 (1995).

83.

The actions of the officers were caused in part by the policies and practices of the City of Atlanta and was a moving force for the harms caused.

## Count III: State Constitutional Privacy Right/Invasion of Privacy and Public Disclosure of Private Facts

84.

The actions of each defendant, individually and collectively, constitute invasion of privacy and public disclosure of private facts and a violation of the Georgia Constitutions privacy right.

Personal, private, secluded and secret data about Gates' identity and anonymous protest was acquired by defendants without authorization or consent of Gates as a result of his arrest.

85.

Prior to Defendants' arrest of Gates and disclosure of his identity, Gates had not made his involvement in an anonymous protest known to the community at large.  Defendants' actions disclosed such information to neighbors, co-workers

and others in a way offensive and objectionable to a reasonable man of ordinary sensibilities.

86.

Under the Georgia Constitution, citizens enjoy the right to engage in peaceable and anonymous demonstrations and to be secure from intrusion by the government and those private persons acting in concert with the government under Georgia Constitution, Article I, section I, paragraph I, V, IX, XIII.  The actions of defendants, individually and collectively, invaded and violated the rights set forth therein.

## Count III: Other Individual State Law Claims

87.

This Count is alleged against the officers in their individual capacities.

88.

By placing Plaintiff under arrest and instituting prosecution, the officers subjected Plaintiff to an unlawful detention in violation of O.C.G.A. § 51-2-70, and committed an assault and battery against Plaintiff in violation of O.C.G.A. §§ 51-1-13 and 51-1-14 and malicious prosecution under O.C.G.A. § 51-7-44.

89.

As the facts alleged indicate, the officers acted with actual malice toward Plaintiff. In making the decision to arrest Plaintiff, the officers each possessed the

deliberate intent to do wrong.

90.

The officers' actions were malicious, reckless, and callously indifferent to Plaintiff's clearly established rights, and they are not entitled to official immunity under Georgia law.

## Count IV: Municipal State Law Claims

91.

This Count is alleged against the City of Atlanta.

92.

Plaintiff provided the City ante litem notice which was delivered via certified mail.

93.

The City of Atlanta did not respond to Plaintiff's ante litem notice at all, and thus declined to settle the potential lawsuit or engage in any settlement discussions.

94.

During the course of his employment and while fulfilling their official duties, the officers violated state law as set out.

The City of Atlanta is liable for the intentional and negligent actions of the officers under the doctrine of respondeat superior for violations of State law. Under that doctrine, the City is not entitled to present a defense of official immunity.

## **PRAYERS FOR RELIEF**

Plaintiff prays that this Court will grant the following relief:

(1) A declaration that a blanket prohibition on the wearing of all masks at

protests in the City of Atlanta is unconstitutional and permanent

injunction against such policy;

(2) Nominal, presumed, and actual damages against each Defendant, and

punitive damages against the individual defendants,  in an amount to be

determined by the enlightened conscience of the jury;

(3) Mr. Gates's attorneys' fees and costs in bringing this action; and

(4) Such further relief as this Court deems just and proper.

Respectfully submitted this 21st day of September, 2015.

/s Cynthia L. Counts___
Cynthia L. Counts
Georgia Bar No. 190280

The Counts Law Group
1384 Lanier Place, NE
Atlanta, Georgia  30306
Phone:  (404) 550-6233
Fax:     (404) 521-4013
email:  ccounts@lawcounts.com

/s Gerald Weber_____
Gerald Weber
Georgia Bar No. 744878

Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, Georgia 31107

Telephone: (404) 522-0507
Email: wgerryweber@gmail.com

Local Rule 7.1(D) Certificate

This is to certify that the foregoing **COMPLAINT** has been prepared with one of the font and point selections approved by the Court in LR 5.1B: Times New Roman, 14 point.

/s Cynthia L. Counts_____
Cynthia L. Counts